# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 14-17V
Filed: October 27, 2014
For Publication

*************************************
CHESLEY GARRETT and DAUN         *
GARRETT, Individually and Representing  *
Their Minor Daughter, K.G.,       *
                                 *
    Petitioners,          *    Attorneys' fees and costs decision;
                                 *    Respondent objects to fee award;
v.                               *    Reasonable basis
                                 *
SECRETARY OF HEALTH              *
AND HUMAN SERVICES,              *
                                 *
    Respondent.           *
                                 *
*************************************

<u>Chesley and Daun Garrett</u>, Big Spring, TX, for petitioners (pro se).
<u>Gordon E. Shemin</u>, Washington, DC, for respondent.

**MILLMAN, Special Master**

### DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

      On May 15, 2014, in conjunction with the withdrawal of Sean Franks Greenwood, Esq. ("Mr. Greenwood") as attorney of record, petitioners filed Petitioners' Application for Interim Award of Attorneys' Fees and Reimbursement of Costs, requesting that the Court award petitioners $4,382.16 in interim attorneys' fees and costs. The undersigned subsequently issued a decision on July 7, 2014, dismissing petitioners' claim based on their failure to prosecute. Judgment entered on August 8, 2014. The fees and costs award is no longer on an interim basis.

---

[1] Vaccine Rule 18(b) states that all decisions of the special masters will be made available to the public unless they contain trade secrets or commercial or financial information that is privileged and confidential, or medical or similar information whose disclosure would constitute a clearly unwarranted invasion of privacy. When such a decision is filed, petitioners have 14 days to identify and move to redact such information prior to the document's disclosure. If the special master, upon review, agrees that the identified material fits within the banned categories listed above, the special master shall redact such material from public access.

For the reasons set forth below, the undersigned awards petitioners $3,992.16 for final attorneys' fees and costs.

**PROCEDURAL HISTORY**

On January 6, 2014, petitioners filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-10–34 (2006), ("Vaccine Act"), alleging that their daughter, K.G., developed type 1 diabetes as a result of the DTaP, IPV, and hepatitis B vaccinations she received on November 9, 2010. Pet. at 1. Both K.G. and her sister, L.G., were vaccinated on the same day and were diagnosed with diabetes a few months later in March 2011. Id. at 1, 2–3.

On January 30, 2014, the undersigned issued an order stating that no allegation of vaccine-caused type 1 diabetes has succeeded in the Vaccine Program. See Hennessey v. Sec'y of HHS, No. 01-190V, 2009 WL 1709053 (Fed. Cl. Spec. Mstr. May 29, 2009), aff'd, 91 Fed. Cl. 126 (Fed. Cl. 2010) (an omnibus proceeding in which now-Chief Special Master Denise Vowell found that vaccines do not cause type 1 diabetes); Meyers v. Sec'y of HHS, No. 04-1771V, 2006 WL 1593947 (Fed. Cl. Spec. Mstr. May 22, 2006) (a decision in which then-Special Master Patricia Campbell-Smith found that vaccines do not cause type 1 diabetes); Baker v. Sec'y of HHS, No. 99-653V, 2003 WL 22416622 (Fed. Cl. Spec. Mstr. Sept. 26, 2003) (an omnibus decision in which the undersigned found that vaccines do not cause type 1 diabetes). The undersigned advised petitioners that presenting the same sort of evidence as the undersigned and others previously considered in other cases would not result in a different outcome.

A telephonic status conference was held on March 7, 2014. Petitioners' counsel requested until May 5, 2014, to locate an expert to offer a different theory of causation than the theories offered in the three cases cited in the undersigned's January 30, 2014, order.

On April 29, 2014, the undersigned issued another order noting a recent decision by Special Master George Hastings, in which he dismissed a case where the petitioner alleged that MMR vaccine caused type 1 diabetes. Crutchfield v. Sec'y of HHS, No. 09-39V, 2014 WL 1665227 (Fed. Cl. Spec. Mstr. Apr. 7, 2014), aff'd, slip. op. (Fed. Cl. Sept. 8, 2014), appeal docketed, No. 15-5010 (Fed. Cir. Oct. 16, 2014). On May 5, 2014, petitioners' counsel filed a status report, in which he stated that petitioners had not found a suitable expert, and he wished to withdraw as counsel.

On May 15, 2014, petitioners' counsel filed a motion to withdraw as attorney of record in this case. With his motion, he provided email addresses and a phone number for his clients. Petitioners' counsel also filed Petitioners' Application for Interim Award of Attorneys' Fees and Reimbursement of Costs on May 15, 2014.

The motion to withdraw was granted on May 16, 2014, and petitioners became *pro se*. In her order granting the motion to withdraw, the undersigned ordered petitioners to contact the undersigned's law clerk to schedule a telephonic status conference. The undersigned's law clerk received no communication from petitioners, and her attempts to contact petitioners were unsuccessful. On June 20, 2014, the undersigned issued an Order to Show Cause, again ordering

petitioners to contact the undersigned's law clerk. This Order was delivered to petitioners via United States Postal Service ("USPS") Certified Mail.

On June 25, 2014, respondent filed a Response to Petitioners' Application for Interim Award of Attorneys' Fees and Costs. Respondent objected to any award of interim fees and argued that reasonable basis could not be determined because no medical records had been filed in the case.

The undersigned issued a dismissal decision on July 7, 2014, after petitioners failed to file a response to the Order to Show Cause or to contact the undersigned's law clerk, and judgment entered on August 8, 2014.

In light of respondent's argument that reasonable basis could not be established without a review of the medical records and because the application was no longer on an interim basis, the undersigned's law clerk directed petitioners' former counsel to send the medical records to respondent. Respondent reviewed the records and filed a supplemental response on September 19, 2014. In her supplemental response, respondent argues that there is no reasonable basis for the claim in fact, science, or law. Supp. Resp. at 14–15.

Respondent has filed the medical records received from petitioners' former counsel. The court has designated these medical records as Exhibits 2–10. See Order, Oct. 22, 2014.

This matter is now ripe for adjudication.

## FACTUAL HISTORY

K.G. was born prematurely on June 29, 2007, at 36.5 weeks gestation. Med. recs. Ex. 9, at 1. She was transferred to the neonatal ICU two days after her birth, with a diagnosis of pneumothorax, clinical sepsis, and stress reducer syndrome versus congenital pneumonia. Id. She was discharged on July 8, 2007. Id. Because she had symptoms of respiratory immature breath pattern with some bradycardia, she had an apnea monitor for approximately one month once she was discharged home. Id. at 3.

K.G. received hepatitis B, DTaP, and IPV vaccinations at Leonard's Pharmacy on November 9, 2010. Med. recs. Ex. 2, at 1; Ex. 10, at 1–2, 4.

K.G. was admitted to Midland Memorial Hospital Emergency Department on March 22, 2011, at 12:06 p.m., for hyperglycemia. Med. recs. Ex. 3, at 1. She had experienced excessive thirst and output for the past two weeks, which had gotten progressively worse in the last week. Id. at 1, 9. She had also been having diarrhea and had lost about 15 pounds in the past several weeks. Id. at 1. The day prior to her admission, because her parents thought they noticed blood in her stool, they took her to her primary care doctor. Id. at 9. While no blood was found in her urine, it was positive for glucose and ketones, and she was referred to the emergency room. Id. at 1, 9. K.G.'s medical history from her emergency room visit notes that her vaccinations were not up to date. Id. at 1, 9. In the emergency room, her blood sugar was measured at 548. Id. at 9. The glucose in her urine was greater than 1000. Id. at 3. K.G. had a mild dry cough but no

significant flu-like symptoms or fever and no abdominal pain, although she was "whiney." Id. The emergency room doctor, Steven Rea, noted K.G. had a "strong family history of diabetes." Id. She was given intravenous sodium chloride 0.9% at 1.3 units per hour. Id. at 4. She was diagnosed with new onset juvenile diabetes mellitus with ketoacidosis. Id. at 11.

A chest x-ray on March 24, 2011 showed parabronchial cuffing, suggesting viral pneumonitis, bronchiolitis, or reactive airway disease. Id. at 14, 21. She complained of a sore throat and worsened cough. Id. at 162. The nurse noted that her throat was slightly erythematous and edematous. Id. A mycoplasma test was IgM positive, and Dr. Prem Gupta prescribed Zithromax on March 26, 2011. Id. at 15.

Dr. Gupta also noted K.G. had a family history of diabetes. Id. at 10. On the father's side, the paternal grandmother as well as some cousins, nephews, and nieces had a history of diabetes. Id. at 10. One or two members of the paternal family had juvenile diabetes onset. Id. at 10. The maternal grandmother also had a history of diabetes. Id. at 10. Mrs. Garrett disputes this history in her affidavit. Ex. 1, at 2–3, n.12. She states that she does not have type 1 diabetes on her side of the family, and only her husband's uncle and cousin have type 1 diabetes. Id.

During K.G.'s 5-day stay at Midland Memorial Hospital, medical staff counseled the family on meal plans, meal schedules, and testing K.G.'s blood sugar. Id. at 103, 108, 218–20. K.G.'s parents tested her blood sugar and administered her medications with supervision from nursing staff. See, e.g., id. at 112, 115, 165. Her pain assessment was frequently at zero, although she was given pain medication on March 22, and March 24, 2011. Id. at 117, 129, 184, 213. K.G. was discharged from the hospital on March 27, 2011, with instructions for her parents to check her urine ketones twice a day and to follow up with Dr. Adcock, an endocrinologist, as well as her primary care physician. Id. at 19, 49.

On April 18, 2011, K.G. visited Dr. Alan Rice, an associate professor of pediatric endocrinology and diabetes at Texas Tech University Health Sciences Center. Med. recs. Ex. 5, at 89. Her primary care physician, Dr. Bruce Cox, had requested a consultation, as she had been diagnosed with diabetes three to four weeks ago. Id. Dr. Rice also wrote that there was a family history of type 1 and type 2 diabetes mellitus. Id. He wrote that there was type 1 diabetes on her paternal side, she had cousins with thyroid problems, and she has an elder brother who is autistic. Id. In addition to K.G.'s diabetes, she also had a goiter. Id. at 90. Dr. Rice wrote the goiter was "clinically stable" but it was "necessary to exclude hypothyroidism as well as celiac disease, which are common in individuals with type 1 diabetes mellitus and goiters." Id. He recommended blood testing for T4, TSH, tissue transglutaminase IgA, and total IgA levels, which came back as normal. Id. at 90, 101. K.G. continued to have follow-up visits with Dr. Daina Dreimane at Texas Tech for her diabetes. Id. at 70–74 (June 2011), 56–60 (September 2011), 28–33 (January 2012), 17–21 (November 2012), 3–8 (September 2013). During these visits, she consistently had an enlarged thyroid, well-controlled diabetes, and a good response to her diabetes treatment. Id.

On February 22, 2013, K.G. visited her pediatrician, Dr. Joseph Chavez, whom she had been seeing since January 9, 2008, to discuss the immunizations she needed. Med. recs. Ex. 7, at 4. Dr. Chavez wrote that he "[d]iscussed immunizations in detail with parents who state that

4

their first immunization caused her Diabetes Mellitus.  I advised them that immunizations do not cause Diabetes Mellitus. The father stated that there have been studies that have shown MMR to be associated with Diabetes Mellitus.  I asked the father to refer me to these journals but refused no answer [sic] but he would like the immunizations done slowly since they live close to the border.  I advised them that they should start with DTaP." Id. at 5.

## DISCUSSION

### I. Entitlement to Fees and Costs Under the Vaccine Act

Under the Vaccine Act, a special master or the Court of Federal Claims may award fees and costs for an unsuccessful petition if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa-15(e)(1); Sebelius v. Cloer, 133 S. Ct. 1886, 1893 (2013).

"Good faith" is a subjective standard.  Hamrick v. Sec'y of HHS, No. 99-683V, 2007 WL 4793152 at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).  A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred.  Turner v. Sec'y of HHS, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007).  Petitioners are "entitled to a presumption of good faith." Grice v. Sec'y of HHS, 36 Fed. Cl. 114, 121 (Fed. Cl. 1996).

"Reasonable basis" is not defined in the Vaccine Act or Program rules.  It has been determined to be an "objective consideration determined by the totality of the circumstances." McKellar v. Sec'y of HHS, 101 Fed. Cl. 297, 303 (Fed. Cl. 2011).  In determining reasonable basis, the court looks "'not at the likelihood of success [of a claim] but more to the feasibility of the claim.'" Turner, 2007 WL 4410030, at *6 (citing Di Roma v. Sec'y of HHS, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993)).  Factors to be considered include factual basis, medical support, jurisdictional issues, and the circumstances under which a petition is filed.  Turner, 2007 WL 4410030, at *6–*9.  Traditionally, special masters have been "quite generous" in finding reasonable basis.  Turpin v. Sec'y of HHS, No. 99-564V, 2005 WL 1026714, at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005); see also Austin v. Sec'y of HHS, No. 10-362V, 2013 WL 659574, at *8 (Fed. Cl. Spec. Mstr. Jan. 31, 2013) ("The policy behind the Vaccine Act's extraordinarily generous provisions authorizing attorney fees and costs in unsuccessful cases—ensuring that litigants have ready access to competent representation— militates in favor of a lenient approach to reasonable basis.").  Special masters have found reasonable basis to file a claim absent medical records or opinions supporting vaccine causation. See Austin, 2013 WL 659574, at *8; Hamrick, 2007 WL 4793152.

### a. Good Faith & Reasonable Basis

Petitioners are entitled to a presumption of good faith, and respondent does not contest that the petition was filed in good faith.  There is no evidence that this petition was brought in bad faith; therefore, the undersigned finds that the good faith requirement is present.

In contrast, respondent does contest that this petition is supported by a reasonable basis. Respondent argues that there is no factual reasonable basis for this petition, as there are no medical records supportive of vaccine causation.  Supp. Resp. at 14.  She argues that there is no

scientific basis for the claim, as the Institute of Medicine has rejected an association between DTaP or hepatitis vaccines and type 1 diabetes. Id. at 14. Respondent further argues that there is no legal basis for the petition, as no allegations of vaccine-caused type 1 diabetes have succeeded in the Vaccine Program. Id. at 15.

Petitioners assert that the petition is supported by a reasonable basis because both Garrett daughters received the same vaccines at the same time and were diagnosed with type 1 diabetes around the same time, the Garretts had minimal family history of type 1 diabetes (though this assertion is not supported by the medical records), and neither daughter exhibited symptoms of diabetes prior to their vaccinations. App. at 2. Petitioners also assert that the time period between the vaccination and diagnosis was indicative of causation. Id. Additionally, petitioners assert that there is a considerable body of research suggesting that vaccines can cause diabetes (although petitioners' counsel later discovered all of this research originated from a single expert, who has been discredited in previous Vaccine Program cases). Id.

Petitioners have filed medical records showing that K.G. received hepatitis B, DTaP, and IPV vaccinations, vaccines covered in the Vaccine Injury Table, on November 9, 2010. Med. recs. Ex. 2, at 1; Ex. 10, at 1–2, 4; 42 C.F.R. § 100.3. There is also support in the medical records that she suffered her alleged injuries: diabetes and an enlarged thyroid. See Med. recs. Ex. 3; Ex. 5.

Respondent is correct that the medical records do not contain any statements supporting vaccine causation. The records detailing K.G.'s diabetes diagnosis and treatment do not mention her hepatitis B, DTaP, and IPV vaccinations. In fact, Dr. Chavez opined that type 1 diabetes is not caused by vaccines. Med. recs. Ex. 7, at 17. However, many claims in the Vaccine Program succeed or settle without treating doctors' opinions in favor of vaccine causation because petitioners are able to find non-treating doctors to provide expert reports.

While no type 1 diabetes case has succeeded in the Vaccine Program, and there does not appear to be reliable scientific evidence that a vaccine can cause type 1 diabetes at this time, the undersigned is not willing to rule that no type 1 diabetes case could ever succeed in the Vaccine Program. Science is constantly evolving, and new medical breakthroughs occur frequently. Congress recognized this when it created the Vaccine Program, as seen by the establishment of an Advisory Commission on Childhood Vaccines, whose responsibilities include recommending revisions to the Vaccine Injury Table. 42 U.S.C. § 300aa-19(f)(2). In fact, the Vaccine Injury Table has been amended seven times since the Vaccine Program was created, most recently in 2011. 42 C.F.R. § 100.3 (2011). It is conceivable that a new scientific theory could emerge that causally connects a vaccine with type 1 diabetes. To rule that no type 1 diabetes case could ever succeed in the Vaccine Program would discourage attorneys from pursuing new scientific theories that could ultimately prove successful, contrary to the purpose of the Vaccine Act. See Saunders v. Sec'y of HHS, 25 F.3d 1031, 1035 (Fed. Cir. 1994) (The purpose of the fee-shifting provision is to "ensure that vaccine-injury claimants will have readily available a competent bar to prosecute their claims under the Act.")

Both of petitioners' daughters were diagnosed with type 1 diabetes several months after receiving vaccinations on the same date. The undersigned finds that the facts demonstrated in

the medical records gave petitioners a reasonable basis to file the petition and attempt to find an expert to support their allegations. A case may have a reasonable basis initially, but lose that reasonable basis as the case proceeds. See Perreira v. Sec'y of HHS, 27 Fed. Cl. 29, 34 (Fed. Cl. 1992) (affirming the special master's award of attorneys' fees and costs up to the point of the evidentiary hearing, when the special master determined counsel should have known the evidence was legally insufficient). Once petitioners' counsel discovered that he could not obtain reliable scientific evidence in favor of vaccine causation and that there was no longer a reasonable basis to proceed, he filed a motion to withdraw in a timely fashion. An award of reasonable attorneys' fees and costs is merited.

## II. Reasonableness of Requested Attorneys' Fees and Costs

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. Avera v. Sec'y of HHS, 515 F.3d 1343, 1347 (Fed. Cir. 2008). The lodestar approach involves a two-step process. First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347–48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348.

The lodestar approach requires that the reasonable hourly rate be multiplied by the number of hours "reasonably expended on the litigation." Avera, 515 F.3d at 1347–48 (quotation and citation omitted). Counsel must submit fee requests that include contemporaneous and specific billing entries indicating the task performed, the number of hours expended on the task, and who performed the task. See Savin v. Sec'y of HHS, 85 Fed. Cl. 313, 316–18 (Fed. Cl. 2008). Counsel must not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." Saxton v. Sec'y of HHS, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." Id. Furthermore, the special master may reduce fees *sua sponte*, apart from objections raised by respondent and without providing petitioners notice and opportunity to respond. See Sabella v. Sec'y of HHS, 86 Fed. Cl. 201, 208–09 (Fed. Cl. 2009).

Attorneys' costs must be reasonable as well. See Perreira, 27 Fed. Cl. at 34 ("The conjunction 'and' conjoins both 'attorneys' fees' and 'other costs' and the word 'reasonable' necessarily modifies both. Not only must any request for reimbursement of attorneys' fees be reasonable, so also must any request for reimbursement of costs.").

Petitioners request fees and costs for Sean Greenwood of Houston, Texas. They filed invoices for fees dating from July 2013 through May 2014, seeking reimbursement in the amount of $3,720.00. While petitioners state in their application that Mr. Greenwood billed at a rate of $300 per hour, many of Mr. Greenwood's 2013 billing entries are billed at a rate of $350 per hour. An invoice for costs is also included with petitioners' application. Petitioners seek $662.16 for attorneys' costs incurred from October 2013 to January 2014.

### a. Mr. Greenwood's Hourly Rate

A reasonable hourly rate is "'the prevailing market rate,' defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" Avera, 515 F.3d at 1348 (quoting Blum, 465 U.S. at 888). In Avera, the Federal Circuit found that in Vaccine Act cases, a court should use the forum rate, i.e., the District of Columbia rate, in determining an award of attorneys' fees. Id. at 1349. At the same time, the court adopted the Davis County exception to prevent windfalls to attorneys who work in less expensive legal markets. Id. (citing Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Envtl. Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)). Under the Davis County exception, in cases where the bulk of the work is completed outside the District of Columbia and there is a "*very significant* difference" between the forum hourly rate and the local hourly rate, the court should calculate an award based on local hourly rates. Id. (finding the market rate in Cheyenne, Wyoming to be very significantly lower than the market rate in Washington, DC). The Davis County exception does not apply when the forum rates are lower than an attorney's local rate. Id.; Rodriguez v. Sec'y of HHS, 2009 WL 2568468, at *19 (Fed. Cl. Spec. Mstr. July 27, 2009).

Petitioners submit that their counsel, Mr. Greenwood, should be compensated at an hourly rate of $300 per hour. Fee App. at 4. Respondent does not contest Mr. Greenwood's hourly rate.

The undersigned finds that petitioners' counsel is entitled to the forum rate in Washington, DC, rather than the local geographic hourly rate in Houston, Texas. Avera, 515 F.3d at 1349. Neither party has presented evidence that the Houston geographic rate is "very significantly lower" than the forum rate. Id.

After reviewing Mr. Greenwood's years of experience, reputation, and skill, and comparing this with other attorneys with comparable factors, the undersigned finds that an hourly rate of $300 for 2013 to 2014 is reasonable. This rate is comparable to the forum rates the undersigned found in 2011. Carcamo v. Sec'y of HHS, 2011 WL 2413345 (Fed. Cl. Spec. Mstr. May 20, 2011) (finding that a forum rate for attorneys in 2006 to 2011 was $275–$360 per hour).

Petitioners note in their application that their counsel's normal rate is $350 per hour, but he reduced his rate to $300 per hour for vaccine cases after opposing counsel objected to the $350 rate. Fee App. at 4, n.3. However, some of the billing entries in the application are nevertheless billed at a $350 rate. See Fee App., Ex. 1, at 1 (all of the 2013 billings except for the billing on August 22, 2013 are billed at a $350 rate). Based on the footnote in petitioners' application as well as the fact that their computation of total fees reflects a $300 rate rather than the $350 rate billed on the invoice, the undersigned assumes that the entries billed at a $350 rate are the result of petitioners' counsel's oversight in changing his rate throughout his billing records. Accordingly, the undersigned reduces Mr. Greenwood's hourly rate to $300 where it was, apparently erroneously, billed as $350.

### b. Reasonable Hours Expended

Petitioners request compensation for 12.4 hours of work expended by Mr. Greenwood. Respondent does not contest the amount of hours expended. After reviewing the invoice, the undersigned finds several of the billed items to be duplicative or unreasonable.

Petitioners note in a footnote that there are some identical billings among the fee applications for L.G.'s case (Case No. 14-16V) and this case. Petitioners state, "Whenever an identical reference appears in a billing entry, Petitioners' counsel split the time between the two cases because it involved projects beneficial to both cases." Fee App. at 4, n.4. Some of these billing entries are split unevenly. For example, on October 1, 2013, petitioners' counsel charged 0.3 hours to L.G.'s account and 0.4 hours to K.G.'s account for "discussions and correspondence with client getting case filed and continue work on petition and affidavit." The undersigned assumes that the uneven split is because petitioners' counsel spent an odd number, 0.7 hours, and the billing entries are broken into 0.1 increments.

However, all of the uneven splits in petitioners' fee application cannot be explained as the division of an odd number. On November 8, 2013, petitioners' counsel billed two hours for "[e]xtended letter to client re causation issues and additional study re same." Fee App., Ex. 1, at 1. In Case No. 14-16V, petitioners' counsel charged 1.2 hours for the same task on the same date. This uneven split is contrary to petitioners' counsel's assertion that he split identical tasks evenly among the cases. Thus, the undersigned reduces the amount billed in this case from 2.0 to 1.2 hours, to coordinate with the billing entry for case number 14-16V.

Additionally, on February 25, 2014, petitioners' counsel billed 0.5 hours for a "[c]onference w/ parents of children w/ potential vaccine injury to explain program and benefits of same." Id. at 3. This billing entry appears to relate to another case altogether. Since this conference took place over a month after the Garrett petitions were filed, the undersigned assumes that these parents were not the Garretts. The undersigned accordingly reduces the hours requested by 0.5.

Accordingly, the undersigned reduces Mr. Greenwood's billing by 1.3 hours (subtracting 0.8 hours for the November 8, 2013 entry and 0.5 hours for the February 24, 2014 entry).

### c. Reasonable Costs Expended

Petitioners request $662.16 in costs. Respondent does not object to any of petitioners' costs. After reviewing the invoice, the undersigned finds the costs requested to be reasonable.

## CONCLUSION

The undersigned finds an award of attorneys' fees and costs appropriate. In sum, the undersigned awards to petitioners the following amount for attorneys' fees and costs:

   **Attorneys' fees for Sean Greenwood:**
    Requested: 12.4 hours at $300 per hour = $3,720.00
    Awarded: 11.1 hours at $300 per hour = **$3,330.00**

   **Costs:**
    Requested: $662.16
    Awarded: **$662.16**

   **Total fees and costs:**
    Requested: $4,382.16
    Awarded: **$3,992.16**

  The undersigned finds this amount to be reasonable and awards **$3,992.16**, representing reimbursement for attorneys' fees and costs. The award shall be in the form of a check made payable jointly to petitioners and Gauthier, Houghtaling, and Williams in the amount of **$3,992.16.**

  In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[2]


**IT IS SO ORDERED.**


Dated: <u>October 27, 2014</u>              _____
                          Laura D. Millman
                           Special Master

---

[2] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party, either separately or jointly, filing a notice renouncing the right to seek review.